IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TAMEKA DALE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:26-cv-00742-BL-JTA |
| | ) | |
| ALABAMA HIGH SCHOOL ATHLETIC ASSOCIATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Two high school students and their mothers challenge the Alabama High School Athletic Association's ("AHSAA") decision declaring the students permanently ineligible to play sports at Mary G. Montgomery High School ("MGM"). Before the court are (1) the Plaintiffs' Motion for a Temporary Restraining Order (doc. 8), which the court treats as a Motion for a Preliminary Injunction because the Defendants received notice and the court held an evidentiary hearing on October 5, 2026, *see* Fed. R. Civ. P. 65(a); (2) a Motion to Dismiss filed by the AHSAA and its Executive Director, Heath Harmon (doc. 10); (3) a Motion to Dismiss filed by Principal David Diaz and Superintendent Chresal D. Threadgill (doc. 24); and (4) a Motion for Relief filed by the AHSAA and Harmon (doc. 19).

For the reasons set forth below, the motions to dismiss are due to be granted, and all claims are due to be dismissed without prejudice. The mothers' individual

claims, the claims against Principal Diaz and Superintendent Threadgill, and the request for an injunction protecting future communications are due to be dismissed for lack of standing. T.D.'s and B.G.'s First Amendment, Equal Protection, and Due Process claims are due to be dismissed for failure to state a claim, and the court declines to exercise supplemental jurisdiction over the state-law claims. Because no claim remains, the Plaintiffs' request for a preliminary injunction is due to be denied as moot. The Plaintiffs' request for leave to amend and the AHSAA's and Harmon's Motion for Relief are also due to be denied.

## FACTUAL ALLEGATIONS

The following facts are provided by the Complaint and its exhibits, which the court accepts as true in deciding the motions to dismiss.[1] The evidence presented on the request for a preliminary injunction is summarized below, but the court does not consider that evidence in deciding the motions to dismiss.

### I. The Parties

The Plaintiffs are two high school students, T.D. and B.G., and their mothers, Tameka Dale and Ashley Davis, who sue individually and on their sons' behalf. The Plaintiffs initiated this action against the AHSAA; Heath Harmon, in his official capacity as Executive Director of the AHSAA; David Diaz, the principal of MGM,

---

[1] At the motion-to-dismiss stage, the court accepts the Complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the Plaintiffs' favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

in his official capacity; and Chresal D. Threadgill, Superintendent of the Mobile County Public School System, in her official capacity. (Doc. 1 at 2–3).

T.D., the son of Tameka Dale, was "an eighth-grade honor student attending Clark-Shaw Magnet School" who was "zoned to attend Vigor High School," which "was classified as a failing school." (Doc. 1 at 7). Dale and T.D. chose MGM based on "MGM's academic opportunities, its extracurricular programs, including band and music, the availability of football, and the fact that a number of T.D.'s longtime friends planned to attend MGM." (Doc. 1 at 7). Dale and T.D. "understood that AHSAA transfer rules would prevent [T.D.] from participating in varsity athletics for one year." (Doc. 1 at 8).

B.G., the son of Ashley Davis, attended Clark-Shaw Magnet School during the 2023-2024 school year, has attended MGM since his freshman year, maintains an A/B grade point average, and plans to graduate in 2028. (Doc. 1-11 at 2–3). Davis asserts that "the signature academies offered at [MGM], as well as the overall academic performance of the school, were factors in [their] decision." (Doc. 1-11 at 2). According to Davis, "B.G. had played football in prior years" and "[b]ecause he wanted to participate in an extracurricular activity and meet other students and make friends, he decided he was interested in playing football at MGM." (Doc. 1-11 at 2). Like T.D., "B.G. did not participate in varsity athletics during his freshman year at [MGM] due to the AHSAA Bona Fide Transfer Rule." (Doc. 1-11 at 3).

Furthermore, "B.G. was also unable to participate in athletics during his sophomore year because of a medical condition." (Doc. 1-11 at 3).

## II. The AHSAA's Recruiting Rule

The AHSAA governs high school athletics among its member schools, including MGM. (Doc. 1 at 2). Its constitution provides that "[a]ll changes in the Constitution and Bylaws shall be made by [the Legislative Council]," and it also gives the Central Board of Control "full authority to adopt rules and regulations." (Doc. 1-19 at 21, 23). The AHSAA's current recruiting rule, Rule VI, Section 12, provides as follows:

> **SECTION 12: RECRUITING.** No person connected in any way with a school may contact a student or prospective student, or his/her parents or guardian who resides outside of the school district to inquire or **encourage** them to transfer or enroll in their school for the chief purpose of participating in interscholastic athletics.
>
> **Note:** This rule includes and applies to any impermissible contact with third party "go-between" individuals connected to a school in any way. Third parties include, but not limited to, trainers, private instructors, outside coaches, boosters, etc.
>
> **Note: Any contact/communication with a student, a student's parents, or any other family member (including elementary students) enrolled in another school, regardless of school zone, including, but not limited to, phone calls, emails, texts, social media, etc. is prohibited.**
>
> It is permissible for a coach, or anyone else connected with a school to talk or speak with a student(s) or parent(s) who, on their own, visit their school for any specific purpose other than athletics.

> Anyone connected in any official capacity with any high school who offers material or financial inducement or enticement to any student to come to that school for the purpose of engaging or enticement to any student to come to that school for the purpose of engaging in athletics shall subject that school to suspension from the AHSAA.
>
> A violation of this rule renders the contacted student permanently ineligible at the school where the violation occurs. A coach in violation of this rule shall be barred from coaching at any AHSAA member school for one year. A school in violation of this rule may be placed on restrictive probation for a period of one year in the sport in which the violation occurred and assessed a monetary fine. Repeated violations of this rule will cause a school to be suspended from the AHSAA.

(Doc. 1-3 at 11–12).[2]

The 2015-2016 version of the rule permitted school personnel to speak with students and parents who visited "for any specific purpose," without the words "other than athletics." (Doc. 1 at 12; Doc. 1-12 at 1). The Plaintiffs allege that the rule was later expanded without the Legislative Council's approval. They assert that the "any contact" note first appeared in 2016-2017, it was extended to parents and family members in 2018-2019, and the words "other than athletics" were added in 2022-2023. (Doc. 1 at 13–17). They further allege that these changes were not marked as amendments in the handbook and that the AHSAA's publication newsletter concerning action taken by the Legislative Council does not show that they were adopted. (Doc. 1 at 14, 17).

[2] The court refers to the second Note as the "any contact" note, and to that note and the words "other than athletics" together as the "challenged language."

## III. Mary G. Montgomery's Freshman Signing Day Events

According to the Complaint, "MGM had conducted substantially similar events in the spring of 2024 and again in the spring of 2025 and 2026." (Doc. 1 at 6). "The event was intended for incoming students and their parents and was designed to communicate the school's expectations for students who intended to participate in the football program during the upcoming school year." (Doc. 1 at 6). According to the Complaint, during the Signing Day Events, "coaches and school administrators spoke with incoming students and their parents concerning the academic, behavioral, and athletic expectations applicable to members of the football program," and students "were also asked to sign a compact acknowledging the standards and expectations applicable to them as student-athletes." (Doc. 1 at 6). The Plaintiffs assert that "MGM did not individually solicit [them], or any other particular student or their parents to attend the Signing Day Party"; rather, "notice of the event was published through MGM's website and social-media platforms and was available generally to persons viewing those public sources." (Doc. 1 at 6–7).

Dale alleges that, while "completing T.D.'s enrollment paperwork" on May 7, 2025, she "first learned that MGM would be conducting its Signing Day Party the following day, May 8, 2025." (Doc. 1 at 8). Dale and T.D. attended the event and "met or spoke with MGM coaches, administrators, counselors, and other school personnel regarding the expectations associated with T.D.'s attendance at MGM and

his anticipated participation in the football program." (Doc. 1 at 8). According to the Complaint, "[b]y the time T.D. attended the Signing Day Party, . . . he and his mother had already selected MGM as the high school [T.D.] would attend, and Mrs. Dale had already completed the necessary enrollment paperwork." (Doc. 1 at 8). The Complaint alleges that "[n]either Head Football Coach Zach Golson nor any other MGM coach recruited T.D. to attend MGM for the purpose of participating in athletics." (Doc. 1 at 9).

Regarding the Signing Day Event that B.G. and Davis attended, the Complaint asserts three different dates: May 8, 2024; May 9, 2024; and May 9, 2025. (Doc. 1 at 10, 30, 44). Davis alleges that, when she and B.G. attended the event, they "met some of the coaching staff and learned more about the expectations the football program and staff demand of players," and that B.G. "had already made the decision to attend MGM . . . and completed the necessary paperwork to be able to attend MGM in the fall of 2024." (Doc. 1 at 10–11). The Complaint alleges that "[a]t no time did any coach from MGM or someone acting on behalf of a coach from MGM recruit Ashley Davis or B.G. to the Signing Day event . . . ." (Doc. 1 at 10).

## IV. The AHSAA's Decision

In April 2026, Principal Diaz "self-reported a violation of AHSAA bylaws related to recruiting," and the AHSAA opened an investigation that included "a review of the information from Baker High School." (Doc. 1-1 at 1). Principal Diaz

sent the AHSAA follow up correspondence in which he provided "names of students who were not zoned for MGM[], but who either spoke with Coach Golson during a visit to Semmes Middle School and/or attended one of [MGM's] Freshmen Signing Day ceremonies," which included T.D. and B.G. (Doc. 1-1 at 2). On May 18, 2026, Harmon "assessed a monetary fine of $300.00" and placed MGM's football program "on restrictive probation, effective immediately through July 31, 2027," which "limits the school's participation to regular-season contests only." (Doc. 1-1 at 4). Harmon also suspended Coach Golson "from coaching at any AHSAA member school for a period of one year" and declared that the named students "are permanently ineligible at MGM[]," though they "may return to their home school or transfer in accordance with AHSAA transfer rules and become eligible." (Doc. 1-1 at 4). The Complaint alleges that, "[d]espite the AHSAA's determination that T.D. and B.G. are permanently ineligible to participate in athletics at MGM, they both have remained enrolled at [MGM]." (Doc. 1 at 11).

## PROCEDURAL HISTORY AND PRELIMINARY-INJUNCTION RECORD

### I. The State-Court Action

Prior to this action being filed with this court, Dale sought a temporary restraining order for T.D. in the Circuit Court of Montgomery County, Alabama. (Doc. 10 at 1 n.1). According to the AHSAA and Harmon, Judge James Anderson heard Dale's request for a temporary restraining order on September 3, 2026, prior

to any complaint being filed. (Doc. 10 at 1 n.1). The AHSAA and Harmon represent to the court that Judge Anderson "denied the requested relief." (Doc. 10 at 1 n.1). However, through correspondence with the court by attorneys representing each party, the Plaintiffs contend that Judge Anderson did not rule on the request for a temporary restraining order. Furthermore, the AHSAA, Harmon, and the Plaintiffs agree that no written order was issued on the request for a temporary restraining order. Dale filed her state-court complaint, which raised only state-law claims, on September 4, 2026. However, the court takes judicial notice[3] that, prior to a scheduled hearing on a Motion to Dismiss, the Alacourt case documents indicate that on September 16, 2026, Dale moved to voluntarily dismiss the state-court action; that motion was granted, and the state-court action was dismissed without prejudice on September 17, 2026.

The court is perplexed as to how a request for a temporary restraining order came to be heard, and, by the AHSAA and Harmon's account, ruled on, in a case that had not yet been filed in the state court. Nevertheless, the court does not resolve the disagreement amongst the parties regarding whether the state court issued an order on Dale's request for a temporary restraining order, nor does it treat the

[3] "Courts may take judicial notice of publicly filed documents, such as those in state court litigation . . . ." *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015).

September 3, 2026, appearance on the request for a temporary restraining order as an adverse ruling on T.D.'s claims.

## II. The Present Action

The Plaintiffs filed this action on September 22, 2026. (Doc. 1). The Complaint asserts First Amendment claims under 42 U.S.C. § 1983 on behalf of each Plaintiff (Counts I, II, III, and IV), Equal Protection claims (Counts V and VI), Due Process claims (Counts VII and IX), and claims under Alabama law (Counts VIII and X). (*See* doc. 1).

Along with the Complaint, the Plaintiffs filed a Motion for a Temporary Restraining Order on September 22, 2026. (Doc. 2). In that motion, the Plaintiffs indicated that MGM was "scheduled to play Baker High School at 7:00 p.m. Friday, September 25, 2026," and that it was "critical that T.D. and B.G. be able to begin playing as soon as possible." (Doc. 2 at 26). On September 22, 2026, the court denied the Plaintiffs' Motion for a Temporary Restraining Order because the court determined it could conduct a hearing on the motion requesting *ex parte* relief prior to the September 25, 2026, football game. (Doc. 5). In that same Order, the court directed the Clerk of Court to restrict public access to the Plaintiffs' Motion for a Temporary Restraining Order, ordered the Plaintiffs to file a redacted version of the motion that complied with Federal Rule of Civil Procedure 5.2(a), and ordered them to serve each Defendant that day. (Doc. 5). On September 23, 2026, after being

notified that MGM's next football game would not occur until October 2, 2026, the court reset the hearing. (Doc. 6). The court also directed counsel to review each filing for compliance with Rule 5.2(a) because the Plaintiffs' original Motion for Temporary Restraining Order identified a minor by his first name. (Doc. 6). The Plaintiffs then filed their redacted Motion for a Temporary Restraining Order (doc. 8) and certified their compliance with Rule 5.2(a) (doc. 21).

On September 23, 2026, the AHSAA and Harmon filed a Motion to Dismiss, arguing among other things that the Plaintiffs lack standing because they "are not members of the AHSAA," that the "Plaintiffs failed to state a claim upon which relief can be granted," and that the court "lacks jurisdiction [over] the parties, the allege[d] cause of action[,] and the subject matter alleged in the Complaint." (Doc. 10 at 2). On September 24, 2026, the AHSAA and Harmon filed a Motion for Relief, asserting that the Plaintiffs' counsel did not provide the filings to them as certified and did not serve the court's September 22, 2026, Order as directed. (Doc. 19 at 1–3). Principal Diaz and Superintendent Threadgill filed a Motion to Dismiss on September 25, 2026, arguing that "[t]here is no further mention of them in the body of the complaint." (Doc. 24 at 1). On September 25, 2026, the court conducted a status conference requested by the AHSAA and Harmon due to defense counsel's scheduling conflict with the originally set September 29, 2026, evidentiary hearing. The court then reset the evidentiary hearing for October 5, 2026, in part because of

"the anticipated length of the hearing" and "the representations made by all parties at [the status conference] that the Plaintiffs [would] not play in the October 2, 2026, football game for safety reasons regardless of the outcome of the hearing." (Doc. 26).

## III. The Preliminary-Injunction Record

On October 5, 2026, the court held an evidentiary hearing on the request for a preliminary injunction in which the court heard testimony from Dale, Davis, Coach Golson, and Harmon. The materials filed in reference to the preliminary injunction show that MGM appealed only its "restrictive probation status," and that the District Board and the Central Board of Control each "voted unanimously" to uphold Harmon's ruling. (Docs. 29-8, 29-9, 29-10). "MGM's first game was played on August 21, 2026." (Doc. 29 at 6). MGM's regular season ends on October 30, 2026, and, at the time of the hearing, four regular-season games remained. (Doc. 19-1 at 4).

At the evidentiary hearing, the Plaintiffs primarily argued that T.D. and B.G. were not recruited and that the challenged language in the AHSAA's handbook was never validly adopted. The AHSAA and Harmon argued that the Plaintiffs bear the burden of proof, that T.D. and B.G. attended a recruiting event, and that the families waited too long to seek relief between the time the AHSAA's sanction was issued and the time the Plaintiffs initiated this action.

Dale testified that the students attending the Signing Day Events signed a "Vikings creed" stating that they would play with class, uphold their grades, be trustworthy, and be classy. According to Dale, after the students were allowed to go on the stage and sign the creed, when they came down off the stage, they took a picture with the head coach. Dale testified that T.D. was allowed to wear a jersey for his picture with the head coach. According to Davis, B.G. was also allowed to wear a jersey at the Signing Day Event he attended, and, when asked whether she ultimately enrolled B.G. at MGM after the Signing Day Event, Davis answered that she did.

Davis testified that B.G. had been medically cleared in January 2026 and participated in MGM's spring game, and that at registration this school year, he was told that he had to drop his varsity athletics class. Importantly, no witness testified at the evidentiary hearing about whether T.D. and B.G. may practice with the team, how long either would need to practice before playing a football game, or whether either could be ready before the season ends. As stated above, the AHSAA's decision was issued on May 18, 2026. At the evidentiary hearing, Dale offered no explanation for waiting until September to seek relief and Davis explained the delay on her part by testifying that she was unfamiliar with everything that was happening and because she had been caught off guard.

# LEGAL STANDARDS

## I. Motions to Dismiss

"Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction can be asserted on either facial or factual grounds." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). "Facial challenges to subject matter jurisdiction are based solely on the allegations in the complaint." *Id.* "When considering such challenges, the court must, as with a Rule 12(b)(6) motion, take the complaint's allegations as true." *Id.* The court must also raise standing on its own when it may be lacking. *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). The Supreme Court has "established that the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, "the plaintiff must have suffered an injury in fact . . . which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* Third, it must be likely, as opposed to merely speculative, that the injury will be "redressed by a favorable decision." *Id.* "[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that

they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Further, the "Supreme Court has been clear that 'standing in no way depends on the merits of the plaintiff's' claim." *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1211 (11th Cir. 2025) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A plaintiff must "allege[] enough facts to nudge his claim . . . across the line from conceivable to plausible." *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 570). Moreover, dismissal is appropriate when, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

## II. Preliminary Injunction

A party seeking a preliminary injunction must establish: (1) a substantial likelihood of success on the merits; (2) that irreparable harm will be suffered absent the relief; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if

issued, would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the "burden of persuasion"' as to each of the four prerequisites." *Id.* (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). "The asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176. Moreover, because a party "must meet all four prerequisites to obtain a preliminary injunction, failure to meet even one" defeats the request for injunctive relief. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

## DISCUSSION

### I. Motions to Dismiss

#### A. Standing

The AHSAA and Harmon argue that "[t]he Plaintiffs lack standing to challenge the rulings or decisions of the AHSAA" because they "are not members of the AHSAA," and that because MGM did not appeal, "there is no justiciable controversy or case before the court." (Doc. 10 at 2–3). The Plaintiffs respond that the AHSAA "confuses standing in the AHSAA's internal appellate process with standing in federal court." (Doc. 30 at 4). Principal Diaz and Superintendent

Threadgill argue only that "the body of the complaint does no[t] state any claim against these Defendants." (Doc. 24 at 3).

**1. T.D. and B.G.**

The AHSAA has declared T.D. and B.G. permanently ineligible to play interscholastic sports at MGM. (Doc. 1-1 at 4). When a plaintiff "is himself an object of the action," "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. T.D. and B.G. need not show that either would play in a game because a plaintiff "need not show that a favorable decision will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Here, T.D.'s and B.G.'s exclusion from athletics at their own school is their injury and each of their claims rests on that injury.

In their First Amendment claims (Counts I and II), T.D. and B.G. allege that their permanent disqualification is "an unconstitutional penalty . . . for the exercise and receipt of protected speech." (Doc. 1 at 24, 31). In their Equal Protection claims (Counts V and VI), T.D. and B.G. allege that the sanction imposed was "based upon the fact that the subject matter of the communication concerned athletics." (Doc. 1 at 49, 57). In support of their Due Process claims (Counts VII and IX) and their state-law claims (Counts VIII and X), T.D. and B.G. allege that the AHSAA declared them ineligible "based upon conduct allegedly prohibited by the disputed

restriction," which "was never enacted . . . through the required process." (Doc. 1 at 67, 74, 80, 87). For each claim, T.D.'s and B.G.'s injury is fairly traceable to the AHSAA's ineligibility decision and an order barring enforcement of that decision, if issued, would redress their injury. *See Baker v. City of Atlanta*, 164 F.4th 850, 861–64 (11th Cir. 2026). Thus, the court finds that T.D. and B.G. have standing to bring their claims against the AHSAA and Harmon, except for their request for an injunction protecting future communications, which the court addresses below. Moreover, because T.D. and B.G. have standing to bring each claim, the court may address the merits. *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1261 (11th Cir. 2021) ("[O]nly one named plaintiff must have standing as to any particular claim in order for it to advance." (citing *Wilding v. DNS Servs. Corp.*, 941 F.3d 1116, 1124–25 (11th Cir. 2019))).

The AHSAA's and Harmon's argument citing *Scott v. Kilpatrick*, 237 So. 2d 652, 656 (Ala. 1970), is not persuasive. *Scott* provided that a student had "no standing in the proceedings" of the association's internal appeal, not that a student cannot bring his own federal claims in federal court. 237 So. 2d at 656. Moreover, Harmon's and the AHSAA's reliance on the fact that MGM did not appeal is misplaced because "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982).

However, one form of relief requested by the Plaintiffs is due to be dismissed. Each count in the Complaint requests that the court "[p]reliminarily and permanently enjoin Defendants from enforcing the challenged provision against Plaintiffs . . . based upon truthful, non[-]coercive communications that do not constitute actual recruiting, solicitation, inducement, coercion, or undue influence." (Doc. 1 at 25, 31-32, 39, 46, 54, 62, 72, 74, 85, 87). Yet, the "any contact" note prohibits contact with students "enrolled in another school." (Doc. 1-3 at 12). T.D. and B.G. are now enrolled at MGM (doc. 1 at 8, 11), so the note does not restrict their communications with MGM's coaches and administrators. The Complaint does not allege that T.D. or B.G. intend to communicate with personnel of any other school, nor does it allege that the AHSAA has threatened to apply the "any contact" note to any future communication.

The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that [a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted). Further, "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Therefore, the court finds that the request to enjoin the

Defendants from enforcing the challenged provision against the Plaintiffs' future "truthful, non[-]coercive communication" is due to be dismissed without prejudice for lack of standing.

**2. Dale and Davis**

Although only one plaintiff needs standing for a claim to proceed, "courts retain discretion to analyze the standing of all plaintiffs in a case and to dismiss those plaintiffs that lack standing." *Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 802 (10th Cir. 2011); *We Are Am./Somos Am., Coal. of Ariz. v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1091 (D. Ariz. 2011) ("[The one-plaintiff] rule does not strictly prohibit a district court, in a multiple plaintiff case such as this, from considering the standing of the other plaintiffs even if it finds that one plaintiff has standing."). A plaintiff "must assert h[er] own legal rights and interests, and cannot rest h[er] claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. Thus, the question becomes whether each mother has alleged a concrete injury of her own apart from her claims as next friend of her son.

Here, both Dale and Davis allege that, "[w]hile at the party," they "communicated with coaches and administrators regarding the football program"; that the Defendants "treated [their] participation in those communications as prohibited conduct under Rule VI, § 12"; and that the rule "burdens [their] ability to speak with and receive information from coaches and public-school employees

concerning athletics." (Doc. 1 at 36–37, 44–45). Davis also identifies B.G.'s disqualification as "an unconstitutional penalty imposed upon Mrs. Davis." (Doc. 1 at 45–46). The mothers also received the information they sought from the Signing Day Event. Dale and T.D. "met or spoke with MGM coaches, administrators, counselors, and other school personnel regarding the expectations associated with T.D.'s attendance at MGM and his anticipated participation in the football program," and Davis and B.G. "met some of the coaching staff and learned more about the expectations the football program and staff demand of players." (Doc. 1 at 8, 10). Thus, the court notes that the Complaint identifies no injury to either Dale or Davis apart from T.D.'s and B.G.'s disqualification, no present restriction on their own speech, and no future communication or right to receive information that the recruiting rule prevents. *See Lyons*, 461 U.S. at 102. Moreover, their requests for "such compensatory damages as may be appropriate" identify no injury to either Dale or Davis that is distinct from T.D.'s or B.G.'s disqualification. (Doc. 1 at 39, 47). Therefore, the court finds that Dale's and Davis's individual claims are due to be dismissed without prejudice for lack of standing. These include Counts III and IV and their individual claims in Counts V, VI, VII, VIII, IX, and X.[4] This ruling

[4] "Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). Thus, "[a] dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice." *Id.*

does not affect Dale's and Davis's capacity to pursue T.D.'s and B.G.'s claims as their next friends pursuant to Federal Rule of Civil Procedure 17(c).

**3. Principal Diaz and Superintendent Threadgill**

Principal Diaz and Superintendent Threadgill argue that "[t]here is nothing in the body of the Complaint that sets forth what they are alleged to have done or failed to do to the plaintiffs that would have violated their federal or state rights." (Doc. 24 at 1–2). The Plaintiffs respond that the May 18, 2026, letter from the AHSAA, an exhibit to the Complaint, "is addressed to Diaz and states that MGM, through communications made to the AHSAA, self-reported alleged recruiting violations; submitted an amended letter; and provided follow-up information used in the AHSAA investigation resulting in sanctions." (Doc. 31 at 1–2). Further, the Plaintiffs assert that Superintendent Threadgill is a proper defendant "to the extent [that] she possesses authority to direct, approve, or prevent [Mobile County Public School System's] implementation of the AHSAA eligibility decision." (Doc. 31 at 2). However, relying on *Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1341–42 (11th Cir. 1999), the Plaintiffs acknowledge that a state or local official "sued for prospective equitable relief must have a real connection to enforcement of the challenged action," and that "a title alone is not enough." (Doc. 31 at 2).

The question here becomes whether T.D.'s and B.G.'s injury is "fairly . . . trace[able]" to each official and whether an order or injunction against that official

would redress it. *Lujan*, 504 U.S. at 560–61. As to Superintendent Threadgill, the Complaint alleges only that she "is being named in her official capacity as the Superintendent of Education for the Mobile County Public School Systems." (Doc. 1 at 3). As to Principal Diaz, the AHSAA's decision letter is addressed to him and describes his correspondence "in which [he] self-reported a violation of AHSAA bylaws related to recruiting." (Doc. 1-1 at 1–4). However, the injury to T.D. and B.G. is the ineligibility determination handed down and enforced by the AHSAA. The Complaint does not allege that Principal Diaz enforces the determination, could set the determination aside, or that an order or injunction against him would restore T.D.'s and B.G.'s eligibility to play. Therefore, the court finds that the claims against Principal Diaz and Superintendent Threadgill are due to be dismissed without prejudice for lack of standing.

**B. Failure to State a Claim**

**1. Due Process (Counts VII and IX)**

Counts VII and IX allege "arbitrary governmental action and enforcement of a rule without lawful authority." (Doc. 1 at 63, 75). The AHSAA and Harmon argue that "the Plaintiffs have no due process rights here" (doc. 10 at 5) and that, "[t]o the extent Plaintiffs invoke a right to due process protection, no such right exists" (doc. 28 at 5). The former Fifth Circuit held that "[t]he privilege of participating in interscholastic athletics" is not a right "secured by the Constitution" and falls

"outside the protection of due process." *Mitchell v. Louisiana High Sch. Athletic Ass'n*, 430 F.2d 1155, 1158 (5th Cir. 1970).[5] It later reaffirmed that "[a] student's interest in participating in a single year of interscholastic athletics amounts to a mere expectation rather than a constitutionally protected claim of entitlement." *Walsh v. Louisiana High Sch. Athletic Ass'n*, 616 F.2d 152, 159 (5th Cir. 1980). Here, the Plaintiffs concede that *Mitchell* "presents a serious obstacle" and that "an allegation of a defect in an association's rule making does not, by itself, establish a federal due process violation." (Doc. 15 at 2, 4). Thus, even accepting the Complaint's allegations as true, Counts VII and IX identify no protected interest other than athletic participation, and "no construction of the factual allegations will support the cause of action." *Marshall Cnty. Bd. of Educ.*, 992 F.2d at 1174. Therefore, the court finds that Counts VII and IX are due to be dismissed without prejudice. The alleged failure by the AHSAA to properly adopt the challenged language remains relevant to the state-law claims.

**2. First Amendment (Counts I and II)**

Counts I and II assert that the AHSAA violated T.D.'s and B.G.'s First Amendment rights. Each student alleges that they are not a voluntary member of the AHSAA (doc. 1 at 22, 29); that their family chose MGM before learning of the

[5] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions issued before September 30, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Signing Day Event (doc. 1 at 10–11, 22–23); that each student and their mother attended the publicly advertised event and "communicated with MGM coaches and school personnel regarding expectations associated with" their "anticipated participation in football" (doc. 1 at 23, 30); that those communications did not cause them to choose MGM (doc. 1 at 23, 30); and that the AHSAA nevertheless "treated [their] participation in those communications as prohibited conduct" and imposed permanent ineligibility (doc. 1 at 23, 30). The students assert that the recruiting rule "burdens [their] ability to speak with and receive information from coaches and public-school employees concerning athletics," and that the disqualification is "an unconstitutional penalty . . . for the exercise and receipt of protected speech." (Doc. 1 at 23–24, 30–31).

Relying on *Tennessee Secondary School Athletic Association v. Brentwood Academy*, 551 U.S. 291 (2007), the AHSAA and Harmon argue that "[t]he Rule in question does not violate the Plaintiffs' First Amendment rights" (doc. 10 at 6) and that the rule "is a legitimate prohibition on communication that serves a legitimate end" (doc. 28 at 10). The Plaintiffs respond that *Brentwood* "upheld enforcement against a member school after its coach sent a targeted invitation to middle-school students concerning football practice," that it "does not resolve the First Amendment claim pleaded here," and that this case "is materially different in both speaker and conduct." (Doc. 15 at 3–4; Doc. 30 at 7).

"To prevail on a claim under § 1983, a plaintiff must demonstrate both (1) that the defendant deprived h[im] of a right secured under the Constitution or federal law and (2) that such a deprivation occurred under color of state law." *Arrington v. Cobb Cnty.*, 139 F.3d 865, 872 (11th Cir. 1998). Here, the AHSAA does not dispute that it acts under color of state law. (*See* Doc. 28 at 6–7). Thus, the question here becomes whether the Complaint plausibly alleges a First Amendment violation.

T.D.'s and B.G.'s claims primarily assert their right to receive information, and the First Amendment protects that right. The Supreme Court has recognized a right to receive information, *see Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas."), and a plurality of the Court has applied that right to the removal of books from a school library, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). However, this court has been unable to find where the Supreme Court or the Eleventh Circuit has applied that right to override an athletic association's restriction on recruiting by its member schools.

"[W]here a speaker exists, . . . the [First Amendment] protection afforded is to the communication, to its source and to its recipients both." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). However, "[f]reedom of speech presupposes a willing speaker," *id.*, and a listener's right generally depends on the speaker's right to share the information. *See Pernell*

*v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1243 (N.D. Fla. 2022) ("[A] university student would not have an independent First Amendment right to receive information that a university professor does not have a First Amendment right to share."), *aff'd sub nom. Pernell v. Fla. Bd. of Governors of State Univ.*, 181 F.4th 1135, 1146 n.4 (11th Cir. 2026) ("No party challenges the district court's conclusion that the students' First Amendment rights rise and fall with those of the professors."); *see also Pico*, 457 U.S. at 867 ("[T]he right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them . . . ."). The *Pernell* district court noted that its analysis would likely differ if the challenged law restricted "students' access to information and ideas beyond its limitations on professors' in-class speech." 641 F. Supp. 3d at 1243 n.18. Here, the recruiting rule restricts only contact by persons connected with member schools; it does not otherwise limit what information students may receive about a school's athletic program. (Doc. 1-3 at 11–12). Thus, taken together, these principles provide that, to state a claim based on a right to receive information, T.D. and B.G. must plausibly allege (1) a willing speaker, (2) whose communication was protected by the First Amendment from the restriction at issue, and (3) a government restriction or penalty on that protected communication. *See Va. Pharmacy*, 425 U.S. at 756; *Pico*, 457 U.S. at 867; *Pernell*, 641 F. Supp. 3d at 1243–44.

Here, the Complaint identifies MGM's coaches and administrators as willing speakers and alleges that the AHSAA penalized T.D.'s and B.G.'s participation in the communication with permanent ineligibility to play sports. (Doc. 1 at 23, 30). Thus, the question here becomes whether the coaches' and administrators' communications at the Signing Day Events were protected by the First Amendment from the AHSAA's recruiting rule. If they were not, T.D. and B.G. had no First Amendment right to receive the information communicated by the coaches and administrators. The court looks to *Brentwood* to address this question.

In *Brentwood*, a coach sent eighth-grade boys a letter "inviting them to attend spring practice sessions," explaining that "football equipment would be distributed," and stating that "getting involved as soon as possible would definitely be to your advantage." 551 U.S. at 294. The Supreme Court recognized that "[t]he First Amendment protects Brentwood's right to publish truthful information about the school and its athletic programs." *Id.* at 295. However, given that Brentwood was a member school, it "made a voluntary decision to join [the association] and to abide by its antirecruiting rule." *Id.* at 299. The Court explained that "an athletic league's interest in enforcing its rules [can] sometimes warrant curtailing the speech of its voluntary participants." *Id.* at 299. Nevertheless, the Court noted that the association could "impose only those conditions on such speech that are necessary to managing an efficient and effective state-sponsored high school athletic league."

*Id.* Moreover, the Supreme Court "need[ed] no empirical data to credit [the association's] commonsense conclusion that hard-sell tactics directed at middle school students could lead to exploitation, distort competition between high school teams, and foster an environment in which athletics are prized more highly than academics." *Id.* The Court's holding allowing the speech restriction rested on Brentwood's voluntary membership in the association.

Four Justices, in part of the opinion that did not receive a majority, also compared the coach's letter to a lawyer's in-person solicitation of clients, which states may restrict. *Id.* at 296–97 (plurality opinion) (discussing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978)). The remaining five Justices rejected that comparison. *See id.* at 305–06 (Kennedy, J., concurring in part and concurring in the judgment); *id.* at 306 (Thomas, J., concurring in the judgment). Justice Kennedy explained that the comparison suggested a coach's speech could be regulated "whether or not the school has entered a voluntary contract with a state-sponsored association," and that "allow[ing] freestanding state regulation of speech by coaches and other representatives of nonmember schools would be a dramatic expansion of *Ohralik*." *Id.* at 305. In short, *Brentwood* allows an athletic association to restrict recruiting speech by its member schools because those schools agreed to follow the association's rules. Here, the speakers were coaches and administrators of MGM, an AHSAA member school. (*See* Doc. 1 at 6; Doc. 1-1 at 4 (warning that MGM

"may be suspended from the AHSAA")). Thus, the communications of MGM's coaches and administrators with prospective students are subject to the conditions the AHSAA may impose on its members under *Brentwood*.

The anti-recruiting rule in *Brentwood* and the AHSAA's recruiting rule share the same basic structure and purpose. In *Brentwood*, the association "prohibited high schools from using 'undue influence' in recruiting middle school students for their athletic programs." 551 U.S. at 294. Here, the recruiting rule likewise provides that "[n]o person connected in any way with a school may contact a student or prospective student . . . who resides outside of the school district to inquire or encourage them to transfer or enroll in their school for the chief purpose of participating in interscholastic athletics." (Doc. 1-3 at 11). Both rules bind member schools and the people connected with them and both are aimed at the recruiting of students who have not yet enrolled. Moreover, both serve the interests that the *Brentwood* Court identified: the association's "three-fold obligation to prevent the exploitation of children, to ensure that high school athletics remain secondary to academics, and to promote fair competition among its members." 551 U.S. at 295–96.

The facts in both this case and *Brentwood* are also similar. In *Brentwood*, the boys to whom the coach sent the recruiting letter had committed to attend the school but had not yet enrolled. *Id.* at 294. Here, as described above, MGM's coaches and

administrators held spring events for "incoming students and their parents," explaining "the academic, behavioral, and athletic expectations applicable to members of the football program," and asked students "to sign a compact acknowledging the standards and expectations applicable to them as student-athletes." (Doc. 1 at 6). In both cases, a member school's coaches communicated with students who had chosen the school, but had not yet enrolled, about joining the school's football program before their first season.

The rules and facts of both cases also differ in four aspects, but none changes the result of this ruling. First, the *Brentwood* letter was sent to particular students, while the Complaint here alleges that "MGM did not individually solicit" the Plaintiffs and that notice of the event was published on MGM's website and social media. (Doc. 1 at 6–7). The Plaintiffs rely on this difference, arguing that *Brentwood* involved "a targeted invitation to middle-school students." (Doc. 15 at 3–4). The distinction between "appeals to the public at large" and "direct, personalized communication in a coercive setting" comes from the portion of *Brentwood* joined only by four Justices. 551 U.S. at 296 (plurality opinion). The majority's holding does not turn on how a member school invites students. Rather, the majority's holding asks whether the restriction is among the conditions "necessary to managing an efficient and effective state-sponsored high school athletic league." *Id.* at 300. The *Brentwood* Court identified three concerns:

exploitation, distorted competition, and athletics "prized more highly than academics." *Id.* Those concerns are present when a member school's coaches gather incoming players to learn about the program's expectations and sign a compact, whether the school advertises the event publicly or sends individual invitations.

Second, the AHSAA's recruiting rule is broader than the rule in *Brentwood*. The *Brentwood* rule prohibited "undue influence." *Id.* at 294. Here, the "any contact" note prohibits "[a]ny contact/communication" with a student "enrolled in another school," and the rule's exception permits conversations only with students or parents who visit on their own "for any specific purpose other than athletics." (Doc. 1-3 at 11–12). However, the scope of the "any contact" note is addressed below in relation to the Plaintiffs' facial challenge. For the as-applied claims, the question is only whether the AHSAA could restrict the communications actually alleged, and *Brentwood* answers that question.

Third, as a penalty for "the three violations," the association's board in *Brentwood* "put Brentwood's athletic program on probation for four years, excluded the boys' basketball and football teams from tournament playoffs for two years, and imposed a $3,000 fine." 551 U.S. at 302–03. Here, in addition to sanctions on the school and coach, the recruiting rule provides that a violation "renders the contacted student permanently ineligible at the school where the violation occurs." (Doc. 1-3 at 12). *Brentwood* did not involve a sanction imposed on students. But as explained

below, the student sanction does not change the analysis because it follows from the member school's violation, not from the students' own speech.

Fourth, in *Brentwood*, "it [was] settled that the coach's pre-enrollment solicitation violated the [association's] antirecruiting rule." 551 U.S. at 294. Here, that issue is not settled because the Plaintiffs dispute whether the challenged language was validly adopted. (Doc. 1 at 12–18). However, that is a question of Alabama law, which the court will not decide. For purposes of the First Amendment claims, the court considers only whether the AHSAA could constitutionally restrict the alleged communications.

Here, accepting the Complaint's allegations as true and drawing all reasonable inferences in T.D.'s and B.G.'s favor, the court finds that the facts alleged do not plausibly show that the recruiting rule, as applied to the communications alleged, violates the First Amendment. The Plaintiffs assert that the Signing Day Event "was intended for incoming students and their parents and was designed to communicate the school's expectations for students who intended to participate in the football program during the upcoming school year." (Doc. 1 at 6). As described above, coaches discussed the program's expectations, and students were asked to sign a compact. (Doc. 1 at 6). B.G. asserts that the event he attended "was to provide new and incoming students . . . information regarding the MGM football program," and the "expectations the coaching staff and administration had for their players, as well

as information concerning fall football camp and the upcoming season." (Doc. 1 at 10). Further, Dale and Davis allege that, "[b]ased upon those conversations, [they] reached the decision to allow" T.D. and B.G. to play varsity football at MGM. (Doc. 1 at 37, 44). These allegations describe an AHSAA member school's coaches bringing prospective players into the football program by communicating team obligations and obtaining student acknowledgment through the signing of a compact before T.D. and B.G. were enrolled at MGM. The AHSAA's rule restricting this type of communication is the type of condition that is "necessary to managing an efficient and effective state-sponsored high school athletic league." *Brentwood*, 551 U.S. at 300. Such a rule guards against recruiting that could "distort competition between high school teams" and "foster an environment in which athletics are prized more highly than academics." *Id.* Like the *Brentwood* Court, this court finds that, as applied to the facts alleged, the AHSAA's "rule discourages precisely the sort of conduct that might lead to those harms, any one of which would detract from a high school sports league's ability to operate efficiently and effectively." *Id.* (internal quotation marks omitted).

The court accepts the allegations that "MGM did not individually solicit the Plaintiffs" (doc. 1 at 6), that no coach recruited T.D. or B.G. (doc. 1 at 9, 10), and that each family "had already selected MGM" or "made the decision to attend MGM" before the event (doc. 1 at 8, 11). However, the court's acceptance of these

allegations does not change the result. The proposition that T.D. and B.G. had already made the decision to attend MGM prior to the Signing Day Events does not exempt T.D. and B.G. from the AHSAA's regulation. The Complaint alleges that Dale "had already completed the necessary enrollment paperwork" (doc. 1 at 8) and that Davis "completed the necessary paperwork to enroll B.G. at MGM . . . after graduation from Clark-Shaw Magnet School" (doc. 1 at 9). However, the Complaint does not allege that either student was actually enrolled at MGM when T.D. or B.G. attended the Signing Day Event. Rather, it alleges that T.D. was then "an eighth-grade honor student attending Clark-Shaw Magnet School" and that B.G. was "nearing graduation from Clark-Shaw Magnet School." (Doc. 1 at 7, 9); *see* Doc. 1-19 at 28 ("A student must be withdrawn from previous school and enrolled at a new school in order to participate in practice, tryouts or interscholastic contests.").

In *Brentwood*, "[w]hile the boys who received the letter had signed a contract signaling their intent to attend Brentwood, none had enrolled within the meaning of [the association's] rules." 551 U.S. at 294. The Court noted that, under the association's rules, "enrolled" meant having "attended 3 days of school." *Id.* The AHSAA's handbook uses a similar measure, providing that, "[f]or eligibility purposes[,] a student is normally considered enrolled when the student has attended school and class on the third day." (Doc. 1-19 at 37). Here, even accepting that the families had completed the necessary enrollment paperwork, the Signing Day Events

took place in the spring, were "intended for incoming students and their parents" (doc. 1 at 6), and were held while T.D. and B.G. were still attending Clark-Shaw and before they would begin attending MGM the following fall (doc. 1 at 8, 11). As in *Brentwood*, the coaches spoke with the students before they started at the high school, and the conversations were about joining the football program. The court notes that its conclusion that the facts alleged do not plausibly state a First Amendment claim is limited to the communication alleged to have taken place at the Signing Day Event, and the court does not hold that the challenged language was validly adopted.

The Plaintiffs also argue that the families initiated their visits to MGM after they had already chosen the school. They assert that their point is "especially significant where, as alleged, the parent initiated the visit and had already chosen MGM before learning of the football event." (Doc. 15 at 3; *see* Doc. 30 at 7). The recruiting rule permits a coach to speak with students or parents "who, on their own, visit their school for any specific purpose other than athletics." (Doc. 1-3 at 11–12). Accepting the Complaint's allegations as true, the communications at issue did not occur during a visit made "for any specific purpose other than athletics." The Complaint alleges that Dale went to MGM on May 7, 2025, "for the purpose of completing the paperwork necessary to enroll T.D. for his freshman year," and that she learned of the Signing Day Event during that visit. (Doc. 1 at 8). But the

communications at issue occurred the next day, when Dale "brought T.D. to MGM to attend the Signing Day Party," where they spoke with coaches and staff about "his anticipated participation in the football program." (Doc. 1 at 8). Similarly, the Complaint alleges that B.G.'s Signing Day Event "had been advertised by word [of] mouth and through the web page for MGM . . . and their social media accounts," and that Davis "learned of the event and decided to take B.G. to MGM . . . for the purpose of attending the Signing Day Party," an event for incoming freshmen "who intended to play football in the fall." (Doc. 1 at 10). Thus, by the Plaintiffs' own account in the Complaint, each family returned to MGM to attend a football program event, not for a "specific purpose other than athletics." The court does not decide how the exception would apply without the words "other than athletics," which is a question of Alabama law. In any event, under *Brentwood*, the question is whether the AHSAA could restrict a member school's coaches from communicating with unenrolled students about joining the football program, and the Complaint alleges that this type of communication occurred here.

Applying the Supreme Court's analysis in *Brentwood*, and accepting the Complaint's allegations as true, the facts alleged do not plausibly show that the AHSAA's recruiting rule violated the First Amendment rights of MGM's coaches and administrators to communicate with T.D. and B.G. As such, T.D. and B.G. cannot plausibly allege that they have an independent right to receive those

communications that MGM's coaches and administrators were restricted from sharing. *See Pernell*, 641 F. Supp. 3d at 1243–44. To the extent that T.D. and B.G. allege that the sanction penalized their own speech (doc. 1 at 24, 31), the only speech they identify is their participation in the same exchanges with MGM's coaches and administrators. (Doc. 1 at 23, 30). The Complaint does not allege any separate statement by T.D. or B.G., and the Plaintiffs have not developed this theory. (*See* Doc. 15 at 3–4; Doc. 30 at 7). Moreover, the recruiting rule does not regulate what students say. Rather, it restricts contact or communication by a "person connected in any way with a school," and the student sanction applies because such a person contacted or communicated with the student in violation of the rule. (Doc. 1-3 at 11–12). The sanction is also limited to the school where the violation occurred, and the "[s]tudents may return to their home school or transfer in accordance with AHSAA transfer rules and become eligible." (Doc. 1-1 at 4). Thus, the sanction serves to strip from the member school the benefit gained by its violation of the recruiting rule rather than punishing the students for their own expression. Because the AHSAA could restrict the member school's communications under *Brentwood*, the Complaint fails to plausibly allege that the recruiting rule unconstitutionally restricted T.D.'s and B.G.'s participation in those communications. Therefore, because the court finds that the facts alleged fail to state a plausible First Amendment

claim, T.D.'s and B.G.'s as-applied First Amendment claims in Counts I and II are due to be dismissed without prejudice.

Counts I and II also bring a facial challenge to the "any contact" note, alleging that it reaches communications "untethered from solicitation, inducement, coercion, undue influence, or any intent to cause a student to enroll for athletic purposes." (Doc. 1 at 21, 24). The AHSAA and Harmon moved to dismiss Counts I and II in full, arguing that "[t]he Rule in question does not violate the Plaintiffs' First Amendment rights." (Doc. 10 at 6; Doc. 28 at 9–10). In their response, the Plaintiffs defended only an as-applied challenge by stating that they "challenge the rule as applied to the alleged facts" (doc. 15 at 3), and they titled their argument "The First Amendment Claim is Plausible and Likely to Succeed as Applied" (doc. 30 at 7). Thus, they did not defend their facial challenge by arguing that the "any contact" note is overbroad. Nevertheless, a law is overbroad only if it "'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,'" and its "unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). Even accepting as true the Complaint's assertion that the note reaches some protected speech, the Complaint alleges no facts that plausibly show the kind of disproportion required by *Hansen*. Therefore, the court finds that the facial

components of T.D.'s and B.G.'s Counts I and II are due to be dismissed without prejudice.

**3. Equal Protection (Counts V and VI)**

Counts V and VI allege that the exception in Rule VI, § 12 lets prospective students and parents who visit on their own discuss "academics, curriculum, advanced courses, music, band, theater, clubs, extracurricular activities, facilities, student life, and other programs," but not athletics. (Doc. 1 at 47–48, 55–56). The AHSAA and Harmon argue that Rule VI, § 12 "passes the rational-basis test by a wide margin." (Doc. 28 at 8). Further, the AHSAA and Harmon assert that "[t]here is no dispute that AHSAA applies its rules equally to all member schools and all student-athletes, including its rules on recruiting and eligibility." (Doc. 28 at 6). The Plaintiffs respond that the distinction "burdens First Amendment activity and bears no rational relationship, as applied to these facts, to preventing recruiting." (Doc. 30 at 8).

A classification that "neither trammels fundamental rights or interests nor burdens an inherently suspect class" need only "be rationally related to a legitimate state interest." *Walsh*, 616 F.2d at 160. The Plaintiffs identify no suspect class, and as stated above, athletic participation is not a fundamental right. *Id.* at 159. Moreover, for the reasons stated above, the Complaint does not plausibly allege that the exception burdened protected speech as applied here. Rational-basis review

therefore applies, and a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Moreover, a classification "may be based on rational speculation unsupported by evidence or empirical data." *Id.* at 315.

Here, the AHSAA has a legitimate interest in preventing recruiting and protecting fair competition. *See Brentwood*, 551 U.S. at 300. Limiting athletic communications with unenrolled, out-of-district prospective students, while allowing talk about academics, band, and other programs, is rationally related to that interest because those programs do not raise the same risk of athletic recruiting. Accepting as true that neither family was recruited or induced to choose MGM (doc. 1 at 23, 30) does not change this conclusion because rational-basis review asks only whether "any reasonably conceivable state of facts" supports the classification. *Beach*, 508 U.S. at 313. Moreover, tethering AHSAA's penalty to eligibility at the school where the impermissible communication occurred takes away the competitive benefit of the communication. Whether the penalty was imposed under a validly adopted rule is a question of Alabama law. Thus, even accepting the Complaint's allegations as true, the facts alleged do not plausibly show that the exception's distinction between athletics and other subjects lacks a rational basis, and "no construction of the factual allegations will support the cause of action."

*Marshall Cnty. Bd. of Educ.*, 992 F.2d at 1174. Therefore, the court finds that the Equal Protection claims in Counts V and VI are due to be dismissed without prejudice.

**C. State-Law Claims (Counts VIII and X)**

Counts VIII and X are the only remaining claims, and they arise under Alabama law. A district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "The decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004). Moreover, the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Id.* at 1089.

This case remains at the pleading stage and, although the parties briefed preliminary relief and presented evidence at a hearing, there has been no trial, and the court has not resolved the merits of the state-law claims. The court has considered judicial economy, convenience, fairness, and comity. The state-law claims allege that the challenged language "was never enacted . . . through the required process" under the AHSAA's governing documents (doc. 1 at 80, 87), which is a question of Alabama law that an Alabama state court is better suited to

decide. As the Supreme Court has noted, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

Therefore, to the extent that Counts VIII and X survive the above standing rulings, the court finds that they are due to be dismissed without prejudice. The court expresses no view on their merits, on the proper construction or adoption of the challenged language under Alabama law, or on entitlement to preliminary relief under state law.

**D. Leave to Amend**

In their responses to the motions to dismiss, the Plaintiffs ask that, if the court "identifies a pleading deficiency in a particular count," they be given "leave to amend that count rather than dismissal of the action in its entirety" (doc. 15 at 5), and they request "leave to amend, if necessary, to allege [Principal Diaz's] connection with particularity" (doc. 31 at 2). Federal Rule of Civil Procedure 15(a)(2) provides that a court "should freely give leave when justice so requires." However, the Eleventh Circuit has "explained that '[f]iling a motion is the proper method to request leave to amend a complaint,' and that a motion for leave to amend 'should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment.'" *Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) (quoting *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999)).

Further, "'[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.'" *Id.* (quoting *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009)). And "[a] district court is not required to grant a plaintiff leave to amend his complaint *sua sponte* when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002). Here, the Plaintiffs, who are represented by counsel, did not file a motion for leave to amend, did not attach a proposed amendment, and did not describe what additional facts an amendment would allege.

Moreover, the court finds that amendment would be futile. "Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed." *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007). The deficiencies identified above are not ones that additional facts could cure. The Due Process claims fail because athletic participation is not a constitutionally protected interest. The as-applied First Amendment claims fail because, under *Brentwood*, the AHSAA could restrict the communications that the Complaint itself describes in detail, and the Plaintiffs have not identified any facts that would show the disproportion *Hansen* requires for their facial challenge. The Equal Protection claims fail because the recruiting rule's distinction between athletics and other

subjects is rationally related to the AHSAA's legitimate interest in preventing recruiting. Dale and Davis have not identified any injury of their own that an amendment could cure. And even if the Plaintiffs alleged Principal Diaz's connection to the AHSAA's decision "with particularity" (doc. 31 at 2), the federal claims against him would still fail for the same reasons as the claims against the AHSAA and Harmon. Finally, the state-law claims are dismissed without prejudice to the Plaintiffs' ability to pursue them in state court. Therefore, the court finds that the Plaintiffs' requests for leave to amend are due to be denied.

## II. Preliminary Injunction

Due to the court dismissing the federal claims as well as declining to exercise supplemental jurisdiction over the state-law claims, no claim remains on which a preliminary injunction could rest. "[T]he very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal*, 840 F.3d at 1248. Thus, the court finds that the Plaintiffs' Motion for a Temporary Restraining Order, which the court has treated as a motion for a preliminary injunction, is due to be denied as moot. Because the court denies the motion as moot, it does not decide whether the Plaintiffs have satisfied the four prerequisites for a preliminary injunction, and the discussion that follows is not to be construed as an alternative ground for the court's

ruling. The court nevertheless notes the following about the record developed at the October 5, 2026, evidentiary hearing.

"A showing of irreparable injury is '"the sine qua non of injunctive relief."'" *Siegel*, 234 F.3d at 1176 (quoting *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). The Plaintiffs argue that their harm is immediate and that "[l]ost practices, games, team participation, development, and opportunities for athletic exposure cannot be recreated after final judgment." (Doc. 30 at 9). The court does not doubt that a missed football game cannot be replayed. However, the Plaintiffs must clearly show, with evidence, that the requested injunction is needed now to prevent harm that is "actual and imminent," rather than "remote" or "speculative." *Siegel*, 234 F.3d at 1176.

Here, the AHSAA declared both T.D. and B.G. ineligible on May 18, 2026. (Doc. 1-1 at 4). B.G. and Davis did not seek relief until this case was filed on September 22, 2026, more than four months later and a month into the football season. T.D. and Dale first sought relief on September 3, 2026, in the Circuit Court of Montgomery County, Alabama. (*See* Doc. 10 at 1 n.1). Although Davis testified at the October 5, 2026, evidentiary hearing that she was unfamiliar with the process and caught off guard, that does not account for the months of inaction following the decision by the AHSAA. Dale offered no explanation at the evidentiary hearing for the delay. The Plaintiffs knew in May 2026 that the AHSAA's decision would make

T.D. and B.G. ineligible to play football at MGM this season, and the loss of the remaining games is the equivalent to the same harm the Plaintiffs waited months to seek relief from. Importantly, the court does not find that the Plaintiffs abandoned their claims or that they were required to appeal within the AHSAA prior to initiating this action. Rather, the court notes only that the Plaintiffs' delay in requesting injunctive relief would weigh against their claimed need for emergency relief.

Thus, had the court reached the merits of the motion, it would have weighed the Plaintiffs' months-long delay, together with the lack of evidence presented at the evidentiary hearing about what an injunction would accomplish before a final adjudication, in deciding whether the Plaintiffs had demonstrated "an imminent injury that would warrant the extraordinary and drastic remedy of a preliminary injunction." *Wreal*, 840 F.3d at 1249 (internal quotation marks omitted). Because no claim remains pending, the court does not decide that question.

## III. Motion for Relief

The AHSAA and Harmon also filed a Motion for Relief, asserting that the Plaintiffs' counsel did not provide the filings to the AHSAA as certified, misstated the date of MGM's next game, and did not serve the court's September 22, 2026, Order as directed. (Doc. 19 at 1–3). They request "any and all relief to which they may be entitled." (Doc. 19 at 3). The Plaintiffs acknowledge that their motion "identified September 25 as the date of the MGM-Baker game" and that "[t]he

correct date is October 2, 2026." (Doc. 15 at 4). However, a motion must "state with particularity the grounds for seeking the order" and "state the relief sought." Fed. R. Civ. P. 7(b)(1)(B)-(C). The Motion for Relief identifies neither the authority under which relief is sought nor the relief requested other than "any and all relief to which they may be entitled." Therefore, the court finds that the Motion for Relief is due to be denied.

## CONCLUSION

Accordingly, for the reasons stated above, it is hereby **ORDERED** as follows:

1. The AHSAA's and Harmon's Motion to Dismiss (doc. 10) is **GRANTED** as set forth below:
    a. T.D.'s and B.G.'s requests for an injunction protecting future communications are **DISMISSED without prejudice** for lack of standing.
    b. The individual claims of Tameka Dale and Ashley Davis are **DISMISSED without prejudice** for lack of standing. This includes Counts III and IV and their individual claims in Counts V, VI, VII, VIII, IX, and X.
    c. T.D.'s and B.G.'s Due Process claims (Counts VII and IX) are **DISMISSED without prejudice** for failure to state a claim.

   d. T.D.'s and B.G.'s First Amendment claims (Counts I and II), both as applied and facially, are **DISMISSED without prejudice** for failure to state a claim.

   e. T.D.'s and B.G.'s Equal Protection claims (Counts V and VI) are **DISMISSED without prejudice** for failure to state a claim.

2. Principal Diaz and Superintendent Threadgill's Motion to Dismiss (doc. 24) is **GRANTED**, and all claims against them are **DISMISSED without prejudice** for lack of standing.
3. The court **DECLINES** to exercise supplemental jurisdiction over the state-law claims in Counts VIII and X, and those claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1367(c)(3).
4. The Plaintiffs' Motion for a Temporary Restraining Order (doc. 8), which the court has treated as a motion for a preliminary injunction, is **DENIED as moot**.
5. The Plaintiffs' requests for leave to amend (docs. 15, 31) are **DENIED**.
6. The AHSAA's and Harmon's Motion for Relief (doc. 19) is **DENIED**.

A separate Final Judgment will be entered.

**DONE** and **ORDERED** on this the 23rd day of October, 2026.

**BILL LEWIS**
UNITED STATES DISTRICT JUDGE